GEORGE T. ROSS LODGE NO. 831 BROTHERHOOD OF RAIL-
ROAD TRAINMEN AND OTHERS v. BROTHERHOOD
OF RAILROAD TRAINMEN AND OTHERS.[1]

April 20, 1934.

No. 29,649.

[1]Reported in 254 N. W. 590.

*Lewis, Hunt & Palmer* and *Elvero L. McMillan,* for appellants.

*Fryberger, Fulton & Boyle* and *Tom J. McGrath,* for respondent Brotherhood of Railroad Trainmen.

*D. F. Lyons, Frederic D. McCarthy,* and *Mitchell, Gillette, Nye & Harries,* for respondents Northern Pacific Railway Company, Garrett H. Jacobus, Norman G. Slade, Walter H. Streeter, and Noah P. White.

*A. G. McKnight* and *Thomas Stevenson, amici curiae,* filed a brief in support of the contention of respondents.

*HOLT, Justice.*

Action for an injunction in which defendants prevailed. Plaintiffs appeal from the order denying them a new trial.

The pleadings are lengthy; so are the findings (covering 40 pages of the record); and the evidence, including documentary exhibits, is voluminous. Therefore a much condensed statement of the controversy must suffice. There were innumerable exceptions to the rulings on evidence; but neither in the motion for a new trial nor on this appeal is error assigned on such rulings save in one particular, which will be hereinafter noted. So it may be said that the appeal is confined to an attack on the findings made and on the refusal to amend them as requested.

An attentive reading of the record fails to disclose any substantial conflict as to the facts. The plaintiffs are a local lodge of the Brotherhood of Railroad Trainmen and certain members of the lodge and employes of the Northern Pacific Railway Company. The defendants are the Brotherhood of Railroad Trainmen, the Northern Pacific Railway Company, certain officials of the brotherhood, and certain executive officers of the railway company. It appears that prior to 1929 the Northern Pacific Railway Company, hereinafter

called the Pacific company, and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, hereinafter referred to as the Soo company, had each a line of railway carrying iron ore from Cuyuna Iron Range mines to docks at West Superior, Wisconsin, and also coal from their docks at the head of Lake Superior to the mines. For reasons not now important, the two railway companies entered into a pooling agreement with reference to the transportation of the ore and coal mentioned. The Pacific company had ore and coal docks of sufficient capacity and connected therewith a switch-yard, known as the Hill avenue yard, in which by trebling the trackage the ore transported by both companies could be handled conveniently. The ore dock of the Soo company needed extensive repairs or rebuilding. Under the pooling agreement, dated April 15, 1929, all trains between the Range and West Superior were to use the tracks of the Pacific company between Deerwood and McGregor and also its Hill avenue yard and the connected dock. The Soo company was to pay an annual rental therefor to the Pacific company of $79,557 until 1938, and $84,387 thereafter. There were other monetary considerations and adjustments in the contract of no bearing on the present dispute. The one provision therein which seems to have furnished the occasion for this suit is paragraph 6 of art. III, reading:

"Both parties shall deliver loaded cars and receive empty cars in Hill avenue yard. The Pacific company shall furnish all locomotives, enginemen and switchmen and other employes required for the handling of the ore business of both parties in Hill avenue yard and on the Pacific company's ore dock and shall handle said business for both parties. Said locomotives, enginemen and switchmen and other employes are herein referred to as engaged in the joint service of both parties, and said yard and dock are herein referred to as jointly used."

This pooling agreement was approved by the interstate commerce commission. The Soo company's yardmen felt aggrieved, and its local lodge of the Brotherhood of Trainmen carried the matter to the Grand Lodge officials, who after a final decision negotiated an

agreement, designated herein as exhibit A, with the Pacific company on the one hand and the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen & Enginemen, and the Brotherhood of Railroad Trainmen on the other. It has ten provisions, and it is enough to say that in substance the paragraph 6 above quoted is eliminated from the pooling agreement and in place thereof the work is evenly divided between the employes of the two railway companies as far as relates to the movements of the cars in the Hill avenue yard and the connected dock which come from trains covered by the pooling agreement. In other words, instead of all the movements of all the ore trains in the terminal yard and dock being done by the Pacific company's employes, half thereof was to be done by the Soo company's men. The Soo company consented to the change or substitution of this agreement for said paragraph 6, art. III, of the pooling agreement. Among the provisions of exhibit A are these: Assignments of service of the employes of each railway are to be made on an equal basis in an effort to equalize engine hours during each ore shipping season; the ore superintendent will decide the assignments between the crews of the Pacific company and the Soo company; the Soo company's employes shall not acquire seniority on the rosters of the Pacific company; and the agreement is to continue in effect during the life of the pooling agreement.

The railway companies involved operate under so-called schedules or contracts not made with the individual men but negotiated by the brotherhoods under their practice and constitution with the railways severally. These schedules are the result of collective bargaining. All railway employes have the benefit of these schedules whether they belong to the brotherhoods or not. Under these contracts or schedules employes are given seniority rights. Plaintiffs insist that exhibit A violates these seniority rights.

One of respondents raises the objection (a) that a suit for an injunction does not lie on behalf of an employe to restrain a breach of a contract of employment, and (b) that if plaintiffs have a cognizable dispute with the Pacific company their remedy is under the federal railway labor act, which must be exhausted before in-

voking the aid of a court of equity. It is not necessary to pass on either objection, for we conclude that plaintiffs have failed to prove that exhibit A violates any rights possessed by employes of the Pacific company under the schedule which has been in force since 1925.

A railway company must be conceded the right to make such contracts with another company in respect to some joint use of tracks and transportation facilities as it deems desirable, provided there is no violation of a statute or of the contract rights of its employes. The pooling agreement is admittedly valid, approved as it was by the interstate commerce commission. The substitution of exhibit A for paragraph 6 of art. III in the pooling agreement was not of a subject matter requiring the sanction of the commission. The Pacific company was not in duty bound to incorporate said paragraph 6 so as to give its employes double the work they otherwise would have in the Hill avenue yard and the annexed dock. If not so bound, it possessed the right to alter or eliminate that paragraph for exhibit A. The basis for this change must strike every disinterested person as fair. The men of each railway were given as nearly as possible the same amount of work in handling the ore transportation as they had before the pooling agreement; that is, if each had one-half of the business, and there is nothing in the record to indicate that one had had more than the other. The amount of work required was reduced somewhat by trebling the trackage of the Hill avenue yard and installing an automatic scale so that a crew could weigh an ore train in six or seven minutes which would have taken more than an hour if weighed upon the ordinary scale. But surely there is nothing in the schedule of June, 1924, which forbids the Pacific company to effect economies in the service; in fact, plaintiffs do not contend to the contrary. It cannot be claimed that the employes of the Pacific company obtained any right, vested or otherwise, to the benefits of the company, reserved by paragraph 6, art. III, of the pooling agreement; hence they could not be legally injured by a change in its terms unless thereby there was some breach of the schedule of June 1, 1924. Paragraph 7 of the findings setting forth the only provisions of

such schedule applicable to seniority and the right to work is not assailed in this appeal. A short summary of the pertinent part may be thus stated:

Trainmen will rank from date they enter service and will have choice of runs on their respective divisions to which their age in service entitles them; trainmen on regular cars or runs who take temporary vacancies on preferred runs or are used as extra conductors will, when displaced, return to former runs or cars if their seniority permits; trainmen will be promoted on their respective divisions, seniority to govern; in case two or more trainmen are examined at the same date, seniority in service will govern relative standing; yardmen will have no rights in train service except as otherwise provided; if any portion of an acquired railroad is added to a division of the Northern Pacific railroad, the number of men required to operate the territory at the time the railroad is taken over will be taken over with the property, and they will retain the seniority rights earned on the acquired property; if work which was formerly performed by Northern Pacific men is added to a run manned by trainmen of the acquired property, or vice versa, it becomes a division run and seniority rule will govern; where switching limits are not defined, yard limits will govern the working zone of yardmen, and yardmen will do all yard, work train, and transfer work within yard or switching limits, except yard of switching limits will not be changed so as to deprive road or yardmen of any work until after conference is held and agreement reached; seniority rights of yardmen will date from the day they first performed service in the yard where employed; the right to preference of work and promotion will be governed by seniority in service; except as otherwise provided, trainmen will have no rights in yard service; the practice will not operate to prevent yardmen from exercising their seniority on preferred assignments; assigned yardmen will not be permitted to exercise their seniority to enable them to work more than one shift in a calendar day period where other yardmen are available, except when displaced by senior yardmen or assignments discontinued; seniority rights of switchtenders will date from

the day they first performed service in yard or terminal where employed; the right to preference of work will be governed by seniority in service; in filling temporary vacancies of switchtenders and no extra switchtenders available, the senior available extra yardmen will be given preference. It was also provided that correct seniority list of yardmen and switchtenders be furnished by the local chairmen every 90 days and copies posted in convenient places in yard offices to which yardmen shall have access at all times; and that no departure from the schedule shall be made without 30 days' notice in writing.

There is nothing in the schedule forbidding the leasing of the joint use of its yard or of any of its property to another railway. The feature or right stressed is seniority. Seniority as used in schedules or contracts between railways and their employes means that the employe who enters the service of a railway as a conductor, locomotive engineer, engineman, trainman, or switchman on a specified division on a certain date must be preferred to the one who enters the same service at a later date. If the work is slack so that fewer men are needed, the one hired last is laid off first. The trial court found that no seniority right of any plaintiff was violated by exhibit A. There is ample support for this finding not only from a consideration of the provisions of the schedule of June 1, 1924, but also in the testimony of the highest brotherhood officials, who had spent many years in the service passing upon disputes relative to seniority rights and construing contracts between railway companies and their employes. Indeed, some of these witnesses were persons whose duty it was to promulgate rules or decisions governing seniority rights.

The reception of the opinion of the witnesses referred to is assigned as error. We think the long experience and familiarity of these men with the practice, rules, and constitution of the brotherhoods qualified them as experts who could aid the court. But, whether properly admitted or not, we are convinced that the other evidence compelled a finding that no provision of the June 1, 1924, schedule was violated by the making and putting in effect of exhibit A.

There is a contention that a separate contract negotiated with the Pacific company in favor of four named employes bears on this controversy. None of the four men is a party to this suit, and the contract was not made for the benefit of any of plaintiffs, so no significance can be attached thereto.

Approached from another angle, the facts disclosed lead to the same conclusion. Schedules or contracts governing the rights of railway employes as to wages, seniority, and working conditions are obtained through the instrumentality of railroad brotherhoods by the method of collective bargaining and are enforced by the courts. George v. C. R. I. & P. Ry. Co. 183 Minn. 610, 235 N. W. 673, 237 N. W. 876. All employes obtain the benefit thereof whether they belong to an affiliated lodge or not. Of course nonmembers can stand in no better position than the members. The rights secured to an employe by schedules the courts will protect even as against the brotherhood of which he may be a member. Piercy v. Louisville & N. Ry. Co. 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; Yazoo & M. V. R. Co. v. Webb (C. C. A.) 64 F. (2d) 902. The brotherhood or its officers are not deemed agents of a member for the purpose of bartering away his individual rights granted by the schedules. But a brotherhood's interpretation of schedules, procured through the efforts of the organization, and its determination of a controversy according to its constitution and practice should mean much to the courts. Had the provisions of exhibit A been inserted in the pooling agreement of April 15, 1929, in place of paragraph 6 of art. III, and plaintiffs had then, as aggrieved parties, started proceedings to protect their rights, in which proceedings the Soo company employes and their local lodge intervened, and therein a final decision had been rendered that no rights of these plaintiffs were violated, we are of the opinion that such decision should be considered conclusive in the courts, there being no fraud or wilful or arbitrary departure from the brotherhood rules and practice in the procedure. There can be no difference in the supposed case and the instant one, where the Soo company employes and their local lodge started the proceeding and plaintiffs came in to oppose, were fully heard, and availed themselves of all

the means the organization provides for the vindication of their alleged rights. The claim that the procedure did not in some respects conform to the constitution and practice of the brotherhoods should receive scant attention. There is nothing to show bad faith or a denial of a full and fair hearing or that an honest consideration was not given to the claims of plaintiffs. There can be no doubt that not only the defendant brotherhood but the Brotherhood of Locomotive Firemen & Enginemen and the Brotherhood of Locomotive Engineers have made a final decision that no violation of plaintiffs' seniority rights under the schedule of June 1, 1924, will result from the two railway companies putting into effect the modification of the pooling agreement by the substitution of exhibit A in place of paragraph 6 of art. III thereof. To hold that plaintiffs are not concluded by the decision of the brotherhoods seems to us destructive of the power of the organization to compose disputes between employer and employes and to weaken the efficacy of collective bargaining deemed so essential to the success of labor organizations. We need cite only a few of the many decisions discussed by counsel, viz: Shaup v. Grand International Brotherhood, 223 Ala. 202, 135 So. 327; Aulich v. Craigmyle, 248 Ky. 676, 59 S. W. (2d) 560; Crisler v. Crum, 115 Neb. 375, 213 N. W. 366.

In the view we take of the case, that there can be no other finding than the one that no seniority right possessed by any plaintiff in virtue of the schedule of June 1, 1924, will be violated or breached in the operation of the Hill avenue yard and connected dock under the pooling agreement as modified by the substitution of the terms of exhibit A in place of paragraph 6 of art. III thereof, the decision must be affirmed without considering the many subsidiary questions which the versatility and industry of able counsel have presented. Nor would it profit to discuss the numerous cases cited as bearing upon those questions.

The order is affirmed.