C. R. GLEASON, *et als. v.* CHARLES F. THOMAS, *et als.*

(No. 8906)

Submitted September 26, 1939. Decided November 21, 1939.

*George I. Neal, W. A. Thornhill, Jr., Eary, Thompson & Vickers* and *W. W. Goldsmith,* for appellants.

*H. C. Heiss, Lively & Lively,* and *J. W. Maxwell,* for appellees.

Fox, President:

Plaintiffs below and appellants here complain of a decree of the circuit court of Fayette County, denying them the relief prayed for in their bill and dismissing the same.

The controversy, one of long standing, involves the seniority rights of the plaintiffs, who are employed as firemen by the Chesapeake & Ohio Railway Company on the Allegheny and New River districts of the Hinton Division of said railway, the crucial question being whether the said two districts constitute one seniority district, as contended by the defendants, or two separate and distinct senority districts, as contended by the plaintiffs. The circuit court held with the contention of the defendants, and entered its decree accordingly, and from which the plaintiffs appeal.

The seniority rights of the employees of the Railway Company involved herein grow out of an existing contract between the Railway Company and the Brotherhood of Locomotive Firemen and Enginemen, hereafter called "The Brotherhood". These rights are determined, as between the employees, by the constitution, rules and regulations of the Brotherhood, acting through its local lodges, the General Committee on Grievances, its International President and Board of Directors, and in some matters the International Convention.. This seems to be admitted, and is further attested by the fact that the Railway Company, although a party to this suit, has not appeared, and, apparently is not concerned as to the outcome of this litigation.

Seniority rights result from the desire of Railway Labor Organizations to protect men of extended service in the right to their jobs, and to select their jobs, in preference to men who have had shorter periods of service. For example, when a man is employed by the Railway Company as a fireman, the date of his employment is noted, and on that notation his seniority rights are based. He takes employment subject to the right of an older employee to be preferred not only in his choice of a job,

but his right to promotion as well; conversely, he is entitled to such preference over those whose employment is subsequent to his own. When, for any reason, there is a reduction in employment, those last employed are generally furloughed, leaving such work as remains in charge of the older employees; and when re-employment occurs, the oldest furloughed men in point of service are first called. The same rule applies to promotions, and the rule is so applied that a fireman promoted to the position of an engineer may, in times of slack work, be forced back to his firemen's job, and recalled to his engine according to his seniority when employment increases.

Seniority districts are established on the Chesapeake & Ohio system, and, ordinarily, men do not work outside their seniority district. Usually, seniority districts correspond with operating divisions or districts, but this is not true in all cases. This statement discloses the importance of a definite determination of what a seniority district is, to the end that employees may know to what territory their seniority rights apply. In the case before us, the plaintiffs claim that the line of the Railway Company between Hinton, West Virginia, and Handley, West Virginia, with all branches, constitutes one seniority district, known as the New River district; while the line from Hinton, West Virginia, to Clifton Forge, Virginia, with all branches, constitutes a separate and distinct seniority district, termed the Allegheny district. On the other hand, the defendants contend that the entire line of the Railway Company from Clifton Forge, Virginia, on the east, to Handley, West Virginia, on the west, with all branches, constitutes one seniority district. It is obvious, of course, that if there is but one district, seniority rights can be exercised from Clifton Forge to Handley, and including all branches; while if there are two districts, those rights are limited to the two districts having their common meeting point at Hinton, and extending east to Clifton Forge and west to Handley.

The Hinton division of the Railway Company at one time included the territory between Hinton and Clifton Forge. About 1905, the division was divided into two operating districts, both having headquarters at Hinton, and extending east and west from that point, to Clifton Forge and Handley, respectively, and known as the New River and Allegheny districts. At one time, the New River and Allegheny districts were included in what was called the Huntington division. Some years later the Clifton Forge division was established and now includes the territory from Hinton east to Clifton Forge. Both before and after these divisions of territory, the New River coal field was in process of development, such development being entirely within the New River district, and branch lines of the railway were constructed into the coal field. In the early days of this development, the jobs on these branch lines were not attractive, and this resulted in their being filled by the men holding the shortest record of service. What is known as the seniority roster or record was kept by the Railway Company at Hinton, and covered the entire Hinton division, but this seems to have been confined to those working outside the coal fields. In time there developed what is termed the "Extra List", made up of those who had served their apprenticeship in the coal fields, and had become available for assignment on a regular run on either the Allegheny or New River districts, or having worked on the main line were demoted. Having reached the extra list, a practice developed under which the employee then had the right to take an assignment on either district, but when he had once made his selection, he was bound thereby, his seniority rights were limited to the district he had selected, and he could not take a job in the other district of the division. However, a fireman, when promoted to engineer, might take his engine job on either district. In practice, too, some men working on the Hinton division have never taken a regular assignment on either district and therefore have unrestricted seniority rights on the entire division.

In the meantime, the coal field jobs became more attractive and better paying, and men on the Allegheny district began to assert their claims to seniority rights under the assumption that there was but one seniority district in the territory covered by the Allegheny and New River operating districts. Then it was that this controversy began to develop some twenty-five years ago. A claim made in 1916 that there were two seniority districts was, in effect, overruled by the joint decision of the President of the Brotherhood and the head of the Brotherhood of Locomotive Engineers. However, in 1922, there originated in the Hinton lodge of the Brotherhood, No. 236, a move to vote on the question of consolidating the two districts and the coal field into one seniority district, which resulted in a vote by which the move was defeated; it was repeated in 1924, with the same result. Plaintiffs place much reliance on these efforts and the votes held, saying that the movement to consolidate in itself admits the fact of separation, while the defendants seemingly ignore this contention and rely upon the fact that the dispute as to whether there was one seniority district or two in the Clifton Forge-Handley territory continued, and also say that the resolution on which the votes were taken recognizes the seniority district as including both the Allegheny and New River operating districts, and calling attention to the fact that the minutes of Lodge 236 show that the first vote taken was on motion of employees in the New River district, while the second vote was taken on motion of employees from each of the two districts.

For many years, probably as far back as 1905, there has been in effect what is now called Rule No. 91 in the 1931 edition of the "Schedule of Wages and General Regulations for Firemen and Hostlers", issued by the Railway Company, and the brotherhood. The pertinent provisions of this rule read:

"Rule 91. As regards the standing and seniority of firemen, the road is districted as follows:
* * *

"(b) The Greenbrier Division and Allegheny District will be one freight and passenger division. The extra work on the Greenbrier Division will be done by the men at Ronceverte.

"(c) Passenger runs, Huntington and Hinton, will be manned by an equal number of men from Kanawha and New River Districts.

\* \* \* \*

"(k) All other districts remain as heretofore established."

The plaintiffs contend that this shows general recognition of the two seniority districts.

Up until 1930, the controversy was waged within Lodge No. 236 of the Brotherhood, made up of employees of both districts and the coal field, treating the coal field as, in some respects, occupying a separate classification. In 1930, a new Brotherhood Lodge was established at Beckley, No. 909, made up largely, if not entirely, of employees in the New River district, and including the coal field, leaving Lodge No. 236 at Hinton for the most part to the employees of the Allegheny district. Since 1930, the two lodges have continued the controversy.

This suit was instituted for the purpose of nullifying the action of the Board of Directors of the Brotherhood, holding that there is one seniority district in the territory from Clifton Forge to Handley. The decision of the Board of Directors was based on two appeals before it from the decision of the Brotherhood president, who had in turn sustained decisions of the General Grievance Committee on separate complaints filed before it by Lodges Nos. 236 and 909. Up to the point where the Board of Directors took charge both lodges had lost their separate contentions, but the controversy between them involved, in the last analysis, the question of whether there was one or two seniority districts in the territory in question. Both appeals to the Board were heard on the same day. Lodge No. 909 (Beckley), being first heard, stated its contention as follows:

"Appeal of Lodge 909 contemplates that firemen who have taken regular assignments on the

Allegheny end of the division will not be permitted to take regular assignments in the coal fields located on the New River end of the division, and that regular assignments in the coal fields should be in the same category as other regular assignments west of Hinton."

This appeal was later denied.

Lodge No. 236 (Hinton) then followed, with a statement of its claim:

"Appeal of Hinton Lodge No. 236. In the appeal of Hinton Lodge 236 we are requesting removal of any and all restrictions that have been imposed upon the seniority rights of firemen (by practice) employed on the territory between Clifton Forge, Virginia, and Handley, West Virginia, including all branch lines, permitting firemen to exercise their seniority rights on any part or portion of the road so defined in accordance with seniority standing as stipulated in seniority roster as of January 1, 1933, Hinton Division firemen."

Whereupon the Board made its decision thereon in the language following:

"After having given careful consideration to all the evidence appearing in the record and the oral statements made at the hearing, the Board of Directors decides that inasmuch as, in the opinion of the Board, there is only one seniority district comprising the territory between Clifton Forge and Handley, including branches, and in view of the fact that there is no schedule rule, agreement, or contract between the Railway Company and the General Grievance Committee which deprives firemen listed on the one and only seniority roster for the Hinton Division from exercising their seniority on all runs on this division, that the appeal of Lodge 236 be sustained and the decision of the International President set aside and that on and after August 1, 1934, firemen on the Hinton Seniority Roster will be permitted to exercise their seniority in accordance with the schedule rules."

This extended recital has been given to emphasize the complexities of the situation before us, and, if possible, throw light on the reasons for the decision which we make.

Two propositions are outstanding and are, in our judgment, decisive of this case. First, the respective powers of the international president and the board of directors of the Brotherhood with respect to this controversy; and, second, the weight to be given to the finding of the authority, within the Brotherhood, which is held to have power to pass upon the same. These will be considered in the order stated.

At this point we think it well to call attention to provisions of the constitution of the Brotherhood with reference to the respective powers of the international president and the board of directors in connection with disputes arising within the organization. Article 2, section 1, sub-section (g) provides that the president

"* * * shall promptly decide all questions and appeals submitted to him by all boards, committees, subordinate lodges or members, said decisions being final, unless reversed by the Board of Directors and punish or reprove all violators of the law as herein provided. Decisions involving interpretation of law shall be final unless reversed by a Convention."

Section 7, sub-section (h), of Article 2, referring to the board of directors, provides:

"They shall have authority, when in session, to deal with appeals, when properly presented by boards, committees, subordinate lodges, Grand Lodge employees, or individual members, and it will be the duty of the board at each meeting to carefully investigate appeals presented to them and to equitably determine the controversy and their decision shall be final."

In connection with appeals, we find the following in section 4 of Article 17:

"(d) A member may appeal from the decision of the chairman of the general grievance committee to the executive committee or to the general grievance committee, and may appeal from decisions of the executive committee or general grievance committee to the International President. * * *

"(e) A member may appeal from the decision of the International President to the Board of Directors. In making his appeal to the Board of Directors the member shall notify the International President of his appeal. The Board of Directors shall have access to the files of the International President, pertaining to cases properly appealed to them and their decision thereon shall be final. * * *

* * * *

"(1) Whenever the decision of the International President under this section involves an interpretation of the laws of the organization it shall be final unless reversed by a Convention."

Section 5 of Article 17 provides:

"(a) A member considering he has not received just treatment by action of a lodge, general grievance committee or legislative board, on any matter not covered in other sections of this article, may appeal to the International President. * * *

* * * *

"(c) An appeal may be taken from any decision of the International President to the Board of Directors on any matter properly submitted, except (1) a decision involving an interpretation of law of the organization, or, (2) a joint decision of the International President and one or more of the chief executives of other railroad organizations on matters involving one or more of the organizations. The member making such an appeal shall notify the International President of his action. Decisions of the Board of Directors shall be final except where a trial is conducted by the board."

It is, we think, admitted that both the international president and the board of directors had authority to

pass on this controversy if the same did not involve an interpretation of the law of the organization, but if it did involve such interpretation, the decision of the president was final, unless the same had been reversed by a convention of the Brotherhood. If it was not a question of law, then the board of directors had a right to entertain the appeal and reverse the action of the president, and its decision in so doing is final. The international president decided this controversy and his decision was reversed by the board of directors, and we are, therefore, confronted with the question as to whether or not the decision of the international president was one from which there was an appeal to the board of directors.

We hold that under the provisions of the constitution quoted above, the board of directors had authority to entertain and pass upon the appeal from the decision of the international president. We do not see that the decision of the president involved the interpretation of the laws of the organization. The controversy is one based upon disputed facts, circumstances and conditions bearing upon the question as to whether or not the holding on the part of the president that there were two seniority districts was justified. The appellants, Beckley Lodge No. 909, seemed to consider the dispute an appealable one, for they appealed a case involving the same basic question from the president to the board, and their appeal was heard along with the appeal of the appellees herein, Hinton Lodge No. 236. The fact that some days later, appellants, through their lodge, did raise a question of law with the president has no bearing on the decision already made which did not cover any question of the laws of the organization. In this connection, it should be noted that in the letter written on behalf of the Beckley Lodge on May 29, 1934, it is stated "We are aware of the fact that we have no appeal from the Board of Directors' decision, in this organization", and then follows the request for a ruling as to whether the board had followed the law in the decision of May 22, 1934, "thereby consolidating the New River and Allegheny District into one seniority

district." As we interpret the decision of the board of directors there was no consolidation of the two districts into one by a holding that "there is only one seniority district comprising the territory between Clifton Forge and Handley, including branches", and it was so interpreted by the international president in his letter of January 9, 1935, which was in reply to the inquiry of the Beckley Lodge, noted above. The power of consolidation rests with the membership. Article 13, sec. 16-e. We are fortified in our conclusion on this point by the provisions of section 1, Article 20 of the Brotherhood constitution, from which we quote:

> "(a)  The provisions of this constitution shall be interpreted and construed according to their most plain and obvious meaning and to accomplish the purpose for which the Brotherhood was organized and is maintained.
> "(b)  Should any doubt arise as to the proper construction of any section or rule thereof, it shall be referred to the International President whose decisions shall be final unless modified or reversed by the ensuing Convention.
> "(c)  All interpretations rendered by the International President on the articles in the constitution, shall, unless rejected by the following convention, be incorporated into the constitution when codified."

Plainly, the words "interpretation of the laws of the organization" used in other sections of the constitution mean "the proper construction of any section or rule thereof", and not complicated questions as to facts and practices, and the effect thereof, such as are shown to have existed in this case.

Having held that the board of directors had a right to pass on the appeal from the decision of the international president, we come to our second proposition, namely: the weight to be given by this court to a decision made by the board of directors. It is conceded that there is no appeal from the said board within the organization, and

unless we find reasons for setting it aside, it will remain as the final settlement of this controversy.

The authorities seem to be uniform on this question. The general rule is stated in 7 C. J. S. 79, sec. 34:

> "In the absence of illegality or injustice ordinarily courts will not interfere in the internal affairs of an association, and the due decision of an association's tribunal as to such matters is controlling. Where, however, civil or property rights are involved, or where the action of the association is clearly illegal, judicial redress may be secured."

And in 4 Am. Juris., 466, sec. 17, it is stated:

> "The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, collusion, or arbitrariness, be accepted by the courts as conclusive. Moreover, it is held that the courts will not undertake to inquire into the regularity of the procedure adopted and pursued by such tribunals in reaching their conclusion."

In *Donovan* v. *Travers*, 285 Mass. 167, 188 N. E. 705, it was held:

> "It is settled law that members of an unincorporated, voluntary association, like the brotherhood, are bound by the determination of the association's tribunals if the decision is reached after observance of the formalities it prescribes, after fair opportunity for presenting their case, where there has been no excess of jurisdiction, no bad faith or capricious, unreasonable or arbitrary action."

These statements of law are supported by a wide range of authority, some of which may be cited. *Connelly* v. *Masonic Mutual Benefit Ass'n.*, 58 Conn. 552, 20 Atl. 671, 9 L. R. A. 428, 18 Am. St. Rep. 296; *International Hod Carriers, etc., Local No. 426* v. *International Hod Carriers, Local No. 502*, 101 N. J. Eq. Rep. 474, 138 Atl. 532;

*Wrightington, Unincorporated Associations,* sec. 58, p. 320; *Harris* v. *Missouri-Pac. Ry. Co.,* 1 Fed. Supp. 946; *Maloney* v. *United Mine Workers,* 308 Pa. 251, 162 Atl. 225; *George T. Ross Lodge* v. *Brotherhood Railroad Trainmen,* 191 Minn. 373, 254 N. W. 590; *McMurray* v. *Brotherhood of Ry. Trainmen,* 50 Fed. (2d) 968; *N. & W. Ry. Co.* v. *Harris,* 260 Ky. 132, 84 S. W. (2d) 69.

There is no question of fraud involved. The parties have had a fair opportunity to present their contentions before the duly constituted authorities of their organization. The proceedings have followed the provisions of the constitution of the Brotherhood as we construe them, and the decision has been handed down by the final arbiter, upon highly controverted facts and circumstances, giving rise to a division of opinion of every board or committee which has considered the matter. We mention these circumstances to show that the question is one on which men do find grounds for disagreement, and to dispel the idea that there was any arbitrary or capricious action on the part of the board of directors when it rendered its decision. Considered from one aspect, there is much in the record which supports the contention of the appellants. The fact that there were two votes on the question of the consolidation of the territory in question in the one seniority district is the strongest single factor in their favor; and yet, we are met with the contention that the votes taken did not serve to settle the controversy, and were not afterwards interpreted as having any effect thereon. One thing may be said with assurance, that never at any time since this controversy began, has there been any unanimous recognition of the existence of one seniority district or the contrary in the territory covered by the New River and Allegheny operating divisions. Each group involved herein has, at times, taken positions, either through lodge action or practice, inconsistent with their final contentions when the basic question was presented to the board of directors, and said board did not, nor can this court hope to be able to, reconcile the many difficulties and inconsistencies developed by the record.

We can only say that the board of directors, having, under authority of the constitution of the Brotherhood, upheld the contention of the appellees, and the trial court, having done likewise, there is, under the authorities quoted and cited above, no justifiable ground upon which we would be warranted in setting aside the decisions so made. The seniority rights of the employees of the railway company arise out of the contract between the company and the Brotherhood (*N. & W. Ry. Co.* v. *Harris, supra*), thus further binding all interested parties into their rights under the constitution of their organization.

We have treated all questions as to the right of the appellants to invoke equitable jurisdiction as having been settled by the decision of this court, in this case, on certification (117 W. Va. 550, 186 S. E. 304); and we do not think such jurisdiction has been ousted by the provisions of the Federal Railway Labor Act. There is no dispute between the employer and employees; nor is there any apparent danger that this controversy will appreciably interfere with commerce among the states.

The decree of the circuit court of Fayette County is affirmed.

*Affirmed.*

HATCHER, JUDGE, dissenting:

It is clear that during the years when the going was hard for firemen on the branch lines of the New River District, they were denied seniority rights on the Allegheny District, and by custom their rights were limited to the New River District. Thus, in fact, two seniority districts existed for years. This is demonstrated beyond cavil by the two votes taken in the Hinton Lodge on the question of consolidating the districts. It is equally clear that the existence of the two districts was not questioned by the Allegheny District until work on the branch lines became more pleasant. Because of this conduct, so self-centered from beginning to end, it seems plain to me that the Allegheny District should be estopped now, as a mat-

ter of law, from claiming that there are not two seniority districts. "Where there is no dispute about the facts and only one inference can be drawn therefrom, it is a question of law whether or not the facts proved constitute an estoppel." 21 Corpus Juris, p. 1253, sec. 270. If this is a legal question, the decision of the president of the Brotherhood was, under its constitution, final. If not a question of law, then I am of opinion that the decision of the Board of Directors is final only when the directors "equitably determine" (the words of the Brotherhood's constitution) a controversy, and that the determination of the Board on this question was so inequitable, it should not be countenanced by a court of equity.