This cause, and another cause pending in this court in which Elwood Allen et al. are complainants, and Pennsylvania-Reading Seashore Lines et al. are defendants, 107/602, *Page 206 
were heard together by consent. The complainants in the above entitled cause, several hundred in number, are members of the Brotherhood of Locomotive Firemen and Enginemen; the defendants are the Pennsylvania-Reading Seashore Lines, a railroad corporation; J.O. Hackenberg, its general manager; B.H. Hudson, its superintendent; Brotherhood of Locomotive Firemen and Enginemen; H.E. Core, its general chairman, and various individual firemen who were former employes of the Atlantic City Railroad Company. The defendants are the same in both causes.
The two causes differ only in the one particular that in this cause all the complainants are members of the Brotherhood of Locomotive Firemen and Enginemen, otherwise known as union men, and in the Allen cause, the complainants are non-members of such brotherhood, otherwise known as non-union men. The same facts apply in both causes, and the only question raised by the Allen cause is that of the power of the brotherhood or its officials to affect the rights of its non-members, employes of the railroad.
The bill seeks, among other things, to invalidate certain rosters now in use of said railroad as a basis of seniority, priority and position of the complainants, and to require the preparation of new rosters for firemen in road and yard service on said railroad to take the place of the rosters now in force, variously referred to as consolidated or dove-tailed rosters.
The controversy in these causes arises out of the unification of that portion of the Pennsylvania Railroad system known as the West Jersey and Seashore Lines and that part of the Reading Railroad system known as the Atlantic City Railroad. This unification was consummated in June, 1933, after the approval thereof by the interstate commerce commission. The method by which it took place was determined by the interstate commerce commission and resulted in the setting up of an operating company known as Pennsylvania-Reading Seashore Lines by the change of the name of the Atlantic City Railroad Company through which latter company the railroad lines in question were unified. *Page 207 
Many problems arose out of the unification of these railroad lines, among which was the setting up of rosters showing the seniority rights of the various employes in train and yard service who were eligible to become employes of the Pennsylvania-Reading Seashore Lines in accordance with their individual ranking in the branches of service to which they had been formerly attached. The effect of the unification naturally was to reduce the number of employes who had theretofore been employed by the respective lines involved, because of reduction in mileage and the abandonment of certain branches theretofore operated.
A large majority of the employes of the railroad company engaged in the engine and train service were members of one or more of the large brotherhoods. These brotherhoods were known as the Brotherhood of Railroad Trainmen, the Order of Railroad Conductors, the Brotherhood of Locomotive Engineers, and the Brotherhood of Locomotive Firemen and Enginemen, which latter brotherhood is one of the defendants in this cause. The other brotherhoods are not parties. The management of the defendant railroad company dealt with the accredited representatives of a majority group of the firemen and hostlers, members of the Brotherhood of Locomotive Firemen and Enginemen, for the purpose of negotiating the schedules and accepting the rosters submitted to such management. This course was pursued in accordance with the provisions of the Railway Labor act. There was no evidence in the case which showed any discrimination against the non-brotherhood employes.
In the case of George T. Ross Lodge No. 831, Brotherhood ofRailroad Trainmen, v. Brotherhood of Railroad Trainmen
(Supreme Court of Minnesota, 1934), 254 N.W. Rep. 590, it was held that "schedules or contracts governing the rights of railway employes as to wages, seniority, and working conditions are obtained through the instrumentality of railroad brotherhoods by the method of collective bargaining and are enforced by the courts, and all employes obtain the benefit thereof whether they belong to an affiliated lodge or not. The non-members of brotherhoods herein can stand in no better *Page 208 
position than the members." The suit of the non-brotherhood employes will be disposed of in the same way as the suit of the members of the brotherhood.
During the period from June 25th, 1933, when the unification was completed, to December 18th, 1933, when the new rosters became effective, the firemen and hostlers whose rights are involved in this cause and who were employed by the railroad company, were governed by the schedule of regulations and rates of pay in effect between the respective railroad lines and their employes prior to the unification. This arrangement was intended merely as a temporary one. During that interval, meetings were held by the eight general chairmen who were representatives of the four brotherhoods. So far as this cause is concerned, the defendant Brotherhood of Locomotive Firemen and Enginemen was represented by its two general chairmen, Harry E. Core, serving for the Pennsylvania Railroad (Lines East) and John G. Richter, for the Reading system. Messrs. Core and Richter represented respectively the groups of firemen and hostlers formerly employed on the West Jersey and Seashore Railroad and the Atlantic City Railroad. A joint meeting of the eight general chairmen was held on October 20th, 1933, and so far as Messrs. Core and Richter were concerned, they were guided by the constitution of the Brotherhood of Locomotive Firemen and Enginemen and particularly by article 13, section 16, sub-division (a), which reads:
"When a railway system, or a portion thereof, is leased or absorbed by another railroad, or when as the result of acquiring or constructing new lines, traffic is diverted from one seniority district to another on any system of railway, it will be the policy of this Brotherhood that when the seniority rights of men are thereby affected, the general grievance committees or committee representing the men involved shall, as soon as possible, agree upon a proper arrangement of the seniority of the men, giving consideration to the number of men affected and their rights, miles of track involved, and amount of business at the time the consolidation is made effective, and so arrange the seniority list or lists that the gains or losses in work will be shared equally by the men involved; provided, should a railroad construct by contract or through its own construction department a piece of track, employing other than its own firemen, subsequently taking same over and operating it as a part of the parent line, firemen thus employed shall gain no seniority rights for their services covering the construction period." *Page 209 
At this joint meeting the eight general chairmen representing all four brotherhoods were present, and it was there announced by Mr. Core that the meeting was called in connection with and for the purpose of deciding on the consolidation of the rosters of the West Jersey and Seashore Railroad and the Atlantic City Railroad, and to decide what committee should thereafter represent the consolidated district. A motion was passed by the affirmative vote of all those present, providing that the two executive committees in consolidating these two rosters should use as a basis for the consolidation the earnings of all firemen on both districts made in the years of 1931 and 1932. The minutes further show that the earnings of the two respective groups bore the following ratio to the combined earnings of those groups: 63.9382 per cent. for West Jersey and Seashore Railroad, and 36.0618 per cent. for Atlantic City Railroad; that it was agreed in formulating the firemen's roster to use a cycle of fourteen men, nine West Jersey and Seashore Railroad men, and five Atlantic City Railroad men, and fixed the relative order in which the firemen of each of the two railroads should be placed or dove-tailed in the roster.
By motion it was further determined that the Pennsylvania Railroad (Lines East) general committee represent the firemen and hostlers on Pennsylvania-Reading Seashore Lines after the consolidation.
Supplementing the minutes it was stipulated that the total earnings of firemen on both the Pennsylvania and Reading Lines involved in the unification for the years 1931 and 1932 amounted to $557,593.84; $201,078.36 being earned by the Atlantic City Railroad firemen, and $356,515.48 by the West Jersey and Seashore Railroad firemen.
The consolidated roster for firemen which later became effective, and which is now the subject of this controversy, was worked out and completed by Messrs. Core and Richter, the general chairmen of the Brotherhood of Locomotive Firemen and Enginemen, representing the firemen of the former West Jersey and Seashore Railroad and the former Atlantic City Railroad. The way in which this roster was made up *Page 210 
was clearly described by Mr. Core and Mr. Richter in their testimony, and so far as possible it followed the method agreed upon at the meeting of the executive committees held on October 20th, 1933. The seniority status of the two groups of employee was determined by their seniority at the time of the unification of the respective railroads, and in order to make up a consolidated roster it was necessary to combine the rosters already in existence by the so-called dovetailing of the two groups of men. These men were thus placed on the consolidated seniority roster by first assigning one fireman from West Jersey and Seashore Railroad, followed by the assignment of one from the Reading system, and thereafter by assigning two West Jersey and Seashore firemen, followed by the assignment of one Atlantic City Railroad fireman, until the cycle of fourteen was completed. The seniority as between the men on the respective lines prevailed in compiling the consolidated roster. Because of some unusual conditions, in certain instances the cycle might exceed fourteen men, as for example, in a case where a man was entitled to a place on the roster but was temporarily or permanently out of actual service and would, in all probability, as testified by Mr. Core, never actually perform service in the Pennsylvania-Reading Seashore Lines; in such circumstances it would be inequitable to use him as an individual in this cycle. The consolidated roster, as finally completed, seems to have been properly made, and while it appears that the "rank as fireman" in the roster, after the exhaustion of all the former Reading employes by the dovetailing process, seems to have the arbitrary date of July 1st, 1930, it is explained that this was only for the purpose of preserving the seniority order. The actual date when the employe affected was "made fireman" appears on the roster and their order of seniority is determined by the roster number. By a letter, dated October 27th, 1933, the general chairman representing the Brotherhood of Locomotive Firemen and Enginemen advised J.O. Hackenberg, general manager of the Pennsylvania-Reading Seashore Lines, that they had completed a consolidation of the engineers' and firemen's roster on the former West Jersey *Page 211 
and Seashore Railroad and former Atlantic City Railroad. The consolidated roster of firemen as compiled by the executive committees was approved by the management of the railroad company and made effective as of December 1st, 1933.
A consolidated roster of hostlers was also prepared on a percentage basis, based upon the earnings for the years 1931 and 1932, excluding the amount of money earned at Camden roundhouse. On this basis the Atlantic City Railroad was given credit for 53.38 per cent. of the total, and the West Jersey and Seashore Railroad, for 46.62 per cent. This roster of hostlers was compiled on the ratio of eight Atlantic City Railroad men to seven West Jersey and Seashore Railroad men; the Atlantic City Railroad was given the first assignment, the second assignment being given to the West Jersey and Seashore Railroad, the names being dovetailed in on a roster in cycles of fifteen, the Atlantic City Railroad getting the assignment of two men in one instance so as to equal the ratio of eight to seven; the hostlers' consolidated roster was made effective as of December 1st, 1933.
After these rosters were placed in effect an appeal, in accordance with the provisions of the constitution of the Brotherhood of Locomotive Firemen and Enginemen, was made to the international president of the brotherhood, Mr. D.B. Robertson, by Lodge No. 72, which lodge consisted of those firemen who were formerly employed by the West Jersey and Seashore Railroad Company. The appeal was taken from the action of the joint executive committees in the formation of the consolidated rosters affecting firemen and hostlers. A hearing was had before a vice-president of the International Brotherhood, sitting in Philadelphia, Pennsylvania, on March 12th, 1934; a decision was made thereon by the international president on March 23d 1934, in which he sustained the appeal and directed a revision of the consolidated seniority rosters; this revision was made in accordance with his decision, setting up the rosters of firemen and hostlers in two groups which are referred to as the A-B rosters. Group A contains the names of the men holding seniority in the former West Jersey and Seashore Railroad prior to unification, and *Page 212 
Group B contains the names of the men holding seniority on the former Atlantic City Railroad prior to unification. This roster became effective on April 23d 1934, and the effect of it was to divide the men according to their affiliations in the two roads before unification. A third group was set up showing the names of the men who entered the employment of the railroad company after unification. Therefore, there was, in effect, rosters containing three groups of men, and Mr. Robertson, the international president, said in his decision that he believed that the plan suggested for dealing with the situation that had arisen out of the consolidation of the property involved would accord to all firemen and hostlers a fair and equitable disposition of their interests. He also there said that the general chairmen and executive committees representing the men employed on the former lines proceeded in accordance with the laws of the brotherhood in handling the situation which arose out of the consolidation of the lines mentioned, and that no question of law was raised in the appeal with respect to the procedure, and that the appeal raised only questions of equity and the effect of consolidation upon the seniority of the men employed on the former lines.
On June 20th, 1934, an appeal was taken from the decision of the international president to the board of directors of the International Brotherhood by Lodge No. 655, which was composed of former Atlantic City railroad firemen. The board of directors, with the exception of its secretary, was made up of seven railroad men from the ranks of the general chairmen of the brotherhood who were men of wide experience, and who appeared, from the testimony of Mr. Core, to have formerly served on some railroad as firemen. The board of directors proceeded to hear that appeal, and also an appeal which was made by Lodge No. 72, composed of men formerly employed by the West Jersey and Seashore Railroad Company. The hearing on these appeals was conducted by the board of directors of the International Brotherhood, sitting at Cleveland, Ohio, and occupied three days, at which hearing Mr. Core, general chairman of the Pennsylvania Railroad (Lines East), was present; also present were the representatives and members *Page 213 
of Lodge No. 72, and members and a representative of Lodge No. 655.
On September 5th, 1934, the board of directors rendered its decision, in which it reversed the international president's decision, and directed the restoration of the plan originally agreed upon by the executive committees, referred to as the consolidated rosters. The opinion of the board of directors contains this language:
"After having given careful consideration to all the evidence appearing in the record and the oral statements made at the hearing, the board of directors decides that inasmuch as, in the opinion of the board the agreement entered into by the executive committees of the general grievance committees on the Pennsylvania Railroad (Lines East) and the Reading Railway which, by request of the two general chairmen, was later placed in operation by General Manager Hackenberg of the Pennsylvania Reading Seashore Lines, equitably divides the work as between the two groups of employes from the Pennsylvania Railroad (Lines East) and the Reading Railway (said agreement being set out in detail in decision of the international president dated March 23d 1934), that the appeal of Lodge 655 be disposed of by the restoration of the plan originally agreed upon by the executive committees; the appeal of Lodge 72 is denied, and the decision of the international president set aside."
Following this decision, and on September 27th, 1934, the consolidated rosters were again put into effect and have so remained in effect since that time.
After the decision of the board of directors of the International Brotherhood, two applications for a re-hearing were made to the board. One of these applications was granted and a re-hearing had; but pending re-hearing, a ruling on the brotherhood law was made by Mr. Robertson, the international president, because the said Lodge No. 72 in its application for a re-hearing raised the question of jurisdiction of the board of directors to reverse the decision of the international president, contending that said decision was an interpretation of the brotherhood's constitution, and therefore *Page 214 
final. The international president, by a ruling made in a communication dated October 19th, 1934, and offered in evidence, sustained the jurisdiction of the board of directors to hear the appeal from the decision of the international president. He commented in his letter on the fact that the question was not raised prior to the decision of the board of September 5th, 1934, and was such a question as should have been raised at that hearing, and not after the decision. Under the brotherhood law, this removed any doubt as to the right of the board of directors to deal further with the case in so far as the questions of law are concerned.
The board of directors then proceeded with the re-hearing, at Cleveland, Ohio, on January 24th, 25th and 26th, 1935; on March 6th, 1935, the board reaffirmed its previous decision. In this latest decision, contained in a communication dated March 6th, 1935, signed by Mr. Tillery, chairman of the board of directors, after referring to the re-hearing, it is said:
"After having given careful consideration to all the evidence appearing in the prior record, to the oral statements that were made at the original hearing and to all the evidence that has been introduced and the oral statements made at the time of the re-hearing, the board of directors decides that, in its opinion, the agreement entered into by the executive committees of the general grievance committees on the Pennsylvania Railroad (Lines East) and the Reading Railroad which, by request of the two general chairmen of these properties, was placed in operation by General Manager Hackenberg of the Pennsylvania-Reading Seashore Lines, arranges the seniority lists so that the gains or losses in work are shared equally by the men involved as contemplated by the considerations set forth in article 13, section 16 (a) of the constitution. The board is of the further opinion that the above referred to agreement equitably determines the controversy between the two groups of employes involved.
"For the foregoing reasons the board adheres to and reaffirms its former decision of September 5th, 1934."
The second application to the board of directors for further *Page 215 
consideration was made on January 2d 1936, by Mr. Core, in his capacity as general chairman. The board, however, declined this application for a re-hearing, as appears by a letter to Mr. Core which reads as follows:
"February 28th, 1936.
Mr. H.E. Core Chairman, GGC., B. of L.F. E. Pennsylvania RR. (Lines East) 930 City Centre Building Philadelphia, Pa.
Dear Sir and Brother:
Referring further to your letter of January 2, 1936, requesting the Board of Directors to grant another rehearing in connection with the consolidation of seniority lists and assignment of men on the territory known as the Pennsylvania-Reading Seashore Lines:
This matter was before the Board on two previous occasions, the original decision having been rendered on September 5, 1934, and, on rehearing, affirmed on March 6, 1935. In each instance, the case was considered and decided upon evidence in the record in addition to the oral statements made at the hearings by a number of witnesses on both sides. In support of your application for a second rehearing, now before the Board, there is submitted a record of assignments and earnings of the former West Jersey 
Seashore Railroad and the former Atlantic City Railroad firemen on the Pennsylvania-Reading Seashore Lines for the year from October 1, 1934, to September 30, 1935, inclusive, upon strength of which the Board is requested to re-open the case.
After a very careful study of the assignment record you now furnish, the Board is of the opinion that it does not throw any further light upon the subject heretofore considered and decided. Upon reviewing the prior record, the Board is convinced that inasmuch as its original decision equitably determined the controversy between the two groups of employes concerned, in light of all the facts heretofore presented to the Board, a further hearing is not warranted.
I am directed, therefore, to advise that your request is declined.
 Yours fraternally, R.J. TILLERY, Chairman, Board of Directors."
Under the constitution of the brotherhood, an appeal was permitted to be made to the next convention of the International Brotherhood. However, no further appeal was taken, and the explanation made by counsel for complainants for the failure to take this appeal was that the convention date was too far distant to make such appeal of any avail. *Page 216 
The objections to the consolidated rosters on behalf of the complainants are based upon the failure of the complainants, or some of them, to receive the proportion of earnings to which they conceive themselves entitled, having relation to such earnings prior to the unification of these railroads, because of the fact that some of the Pennsylvania men had seniority rights on other branches than those now operated by the Pennsylvania-Reading Seashore Lines and therefore might obtain employment thereon, and that failure to take this element into account resulted in advancing former Reading men to more favorable positions on the rosters as respecting work, the Reading men having no seniority rights on any other line. This, perhaps, might, in some instances, result in the reduction of the proportion of earnings which the Pennsylvania men claim should be theirs on the basis upon which the roster of seniority was set up. However, the testimony indicates that the consolidated roster was set up in accordance with the action of the executive committee and these objections on behalf of the complainants were urged upon and considered by the international president in the appeal to him, and by the board of directors of the International Brotherhood upon the appeal from the president's decision. Many days were occupied in presenting these appeals, hearing the witnesses and considering the testimony, and I can find no justification for this court to set aside the consolidated roster now in effect. In accordance with the opinion of the board of directors of the International Brotherhood, the last body to which an appeal was made, the general chairmen acted in the utmost good faith in the preparation of the roster, upon the plan authorized by the executive committee.
There is nothing in the evidence produced before me indicating any semblance of fraud; on the contrary, the rosters appear to be the result of conscientious effort upon the part of the brotherhood representatives to fairly preserve the seniority rights of these employes.
"The courts will not interfere with the internal affairs of an unincorporated association so as to settle disputes between the members of *Page 217 
questions of policy, discipline, or internal government so long as the government of the society is fairly and honestly administered in conformity with its laws and the law of the land and no property or civil rights are invaded. Conversely, the proceedings of the association are subject to judicial review where there is fraud, oppression, or bad faith, or property or civil rights are invaded, or the proceedings in question are violation of the laws of the society or the law of the land, or are illegal. Even in these cases, however, the courts will not take jurisdiction unless the complaining member has exhausted such remedies as may be provided by the laws of the association itself." 5 Corp. Jur. 1364.
In the case of Maloney v. District No. 1, United MineWorkers of America, 308 Pa. 251; 162 Atl. Rep. 225, Mr. Justice Kephart, speaking for the supreme court of Pennsylvania, said:
"When the officers of an association such as this in good faith, and in a reasonable, proper and legal manner under their by-laws and constitution exercise their duties as a tribunal to settle disputes on matters pertaining to the association or the rights of any of its members, such exercise cannot be questioned collaterally; the courts may judge whether the exercise is arbitrary, and review the form of proceedings to see whether the tribunal has acted within its jurisdiction and in the line of order, but cannot review the case on its merits. Courts entertain jurisdiction to keep these tribunals within their own laws, and to correct abuses, so as to preserve, on the one hand, the right of the association, and on the other, that of the members; but they do not inquire into the merits in a regular course of proceeding." Citing Carlin v. Ancient Order of Hibernians,54 Pa. Super. 512; Lytle v. New Castle AgriculturalAssociation, 91 Pa. Super. 152; Commonwealth v. UnionLeague, 135 Pa. 301; 19 Atl. Rep. 1030; S.L.R.A. 195;20 Am. St. Rep. 870; Beeman v. Supreme Lodge, 215 Pa. 627;64 Atl. Rep. 792.
In the case of Donovan v. Travers (Supreme Judicial Courtof Massachusetts, 1934), 188 N.E. Rep. 705, the court said:
"It is settled law that members of an unincorporated, voluntary association, like the brotherhood, are bound by the determination of the association's tribunals if the decision is reached after observance of the formalities it prescribes, after *Page 218 
fair opportunity for presenting their case, where there has been no excess of jurisdiction, no bad faith or capricious, unreasonable or arbitrary action."
I am thoroughly convinced that this case is not, in any of its aspects, of such nature as would warrant this court in interfering with the action taken by the representatives of the brotherhood in conjunction with the railroad management. The railroad management accepted the rosters showing the seniority of the men as presented to it, then changed to group rosters after the decision of the international president, and still later returned to the consolidated rosters first presented to it after the decision of the board of directors of the International Brotherhood, and it seems to me that the agreement which was entered into, as evidenced by the correspondence, the interpretations agreed to by the brotherhood's representatives and the railroad management, become and is still binding among all the parties.
The complainants raise the question that a contract existed between the management of the Pennsylvania-Reading Seashore Lines and the men, by which they had protected seniority rights because of their employment upon the former West Jersey and Seashore Lines and the Reading Railroad. It would seem that such rights as existed respecting the former railroads, ceased upon the men becoming employes of the defendant railroad company because of the protection of those rights under the agreement between the railroad management and the representatives of the brotherhoods at the time the unification took place. Therefore, the complainants are entitled to no intervention by this court with respect to such seniority rights in this cause. It appears to me that such inequalities as the complainants urge as reasons why they are entitled to injunctive relief and specific performance of alleged seniority contracts, are matters that may be well disposed of through the regular channels within the brotherhood in accordance with the constitution and the rules and regulations governing the same.
I was impressed, during the hearing of this cause, with the zeal of the men to protect their rights, and also with the *Page 219 
honesty of purpose, good faith, and desire to do justice, displayed by the representatives of the brotherhoods, as well as the international officers and board of directors to whom appeals were made, and with the fidelity with which their duties were performed. In this cause nothing has come to my attention which impels me to interfere with the actions taken within the brotherhood affecting the matters in controversy, for the reasons which I have given.
 The bill of complaint will be dismissed. *Page 220