This matter involves a dispute concerning the rights of seniority of the complainants, who were one-time employees of the Atlantic City Railroad Company, a subsidiary of the Reading Railroad Company, and the defendants, who, except for Harry Babcock, the Pennsylvania-Reading Seashore Lines and the Brotherhood of Locomotive Firemen and Enginemen and its several lodges, were one-time employees of the West Jersey and Seashore Railroad Company, a subsidiary of the Pennsylvania Railroad Company.
The original cause for this dispute found its inception in the consolidation, merger or unification of the Atlantic City Railroad Company and the West Jersey and Seashore Railroad Company, with the resulting birth of a new corporation known as the Pennsylvania-Reading Seashore Lines. Prior litigation between these parties was had in this court and the decision therein is reported in Franklin v. Pennsylvania-Reading Seashore Lines,122 N.J. Eq. 205; 193 Atl. Rep. 712. The controversy arises, as did that in Franklin v. Pennsylvania-Reading Seashore Lines,supra, out of an attempt to set up a roster showing the seniority rights in the Pennsylvania-Reading Seashore Lines of the firemen theretofore employed by the Atlantic City Railroad Company and the West Jersey and Seashore Railroad Company. There was no precedent for establishing the seniority rights of the employees of the parent companies in the new company. The facts in connection with the preliminary negotiations and final determination of the method of preparing a seniority roster are succinctly and clearly set forth in Franklin v.Pennsylvania-Reading Seashore Lines, supra, and for the *Page 590 
sake of brevity, such facts as therein set forth are to be considered as findings herein.
The union firemen employed by the West Jersey and Seashore Railroad Company were members of Lodge No. 72 of the Brotherhood of Locomotive Firemen and Enginemen, and the union employees of the Atlantic City Railroad Company were members of Lodge No. 655 of the Brotherhood of Locomotive Firemen and Enginemen. It is conceded by all parties that the Brotherhood of Locomotive Firemen and Enginemen was the collective bargaining agent for the firemen, union and non-union, involved in this litigation within the purview of the Railway Labor Relations Act.45 U.S.C.A., §§ 151 et seq.
Subsequent to the facts recited in Franklin v.Pennsylvania-Reading Seashore Lines, supra, the following occurred:
On July 5th, 1937, and August 12th, 1937, applications were made to the board of directors of the Brotherhood of Locomotive Firemen and Enginemen on behalf of Lodge No. 72, seeking a re-hearing by the said Brotherhood, which said application was denied on October 4th, 1937. Thereafter a further application was made to said board of directors of said Brotherhood on behalf of Lodge No. 72, requesting that the matter in controversy be reconsidered for the purpose of remanding the same to the General Committee, which application was denied on February 26th, 1938. On March 19th, 1938, an additional application was made to the said board of directors seeking to re-open the matter, which request was again denied. On April 5th, 1938, a further application was made on behalf of Lodge No. 72 seeking a conference. This latter request was denied by the board of directors on April 6th, 1938. On July 23d 1940, a request was made to said board of directors by Lodge No. 72, again seeking to have the matter re-opened for the purpose of reviewing the case, in view of the actual results of the consolidated roster under which the Pennsylvania-Reading Seashore Lines was functioning. At the time this last application was made, the personnel of the board of directors of the Brotherhood had completely changed by reason of the expiration of the terms of certain members and the election of new members to fill *Page 591 
vacancies which had occurred. This latter application was as well denied, as were the prior ones, by letter dated August 16th, 1940, which contained the suggestion that:
"If the General Grievance Committee on the Pennsylvania Lines East and Pennsylvania Reading Seashore Lines is able to suggest changes which, in its opinion, will be in the interest of those affected, and which it believes will be workable and an improvement on the seniority arrangement now in effect on the Pennsylvania-Reading Seashore Lines, and will submit such suggested changes to the Board of Directors, I have been instructed to advise that the Board can then, if it sees fit, give consideration to reviewing the changes suggested, and as a result, can also, if deemed advisable, give consideration to remanding the case to the General Grievance Committee for its further consideration, provided, of course, that in the process of remanding the case, such action would, in turn, be concurred in by the International President."
In accordance with such suggested proceeding, Lodge No. 72 took the necessary and requisite steps. On April 2d 1941, the General Grievance Committee, theretofore having had presented to it a recommendation as to whether a plan should be formulated and presented to the board for its consideration, referred the matter to said executive committee for the formulation of a plan to take care of the inequities in the seniority roster. On April 4th, 1941, the executive committee submitted a recommendation to the General Committee for the preparation of a roster to be substituted for the roster which had been effective, except for a brief interval, since December 1st, 1933. The roster of December 1st, 1933, was termed "Consolidated Seniority Roster" and the new proposed roster was termed "Adjustable Seniority Roster." These two rosters will hereafter be referred to by the above titles. The General Grievance Committee did thereafter, on April 4th, 1941, approve the plan for an adjustable seniority roster. On May 15th, 1941, the General Grievance Committee's proposed new roster was forwarded to the board of directors for its consideration. The board of directors fixed and set July 14th, 1941, at Denver, Colorado, as the time and place when it would meet to consider the adoption of the adjustable seniority roster. Written notice of the time and place of said hearing was sent by mail on July 9th, 1941. At the time the notice *Page 592 
was received by Lodge No. 655, H.H. Harris, who was alleged to have been the one best qualified and fitted because of his intimate knowledge concerning this dispute to represent Lodge No. 655, was in Denver, Colorado, attending the national convention of the Brotherhood. On July 14th, 1941, the said Harris appeared before the board and requested that the matter be continued for the reason that he did not have sufficient opportunity to prepare himself to argue. Application for the continuance was denied and the board of directors proceeded with the hearing. On July 15th, 1941, the said board of directors ordered that the matter be remanded to the General Grievance Committee through the International president, provided the International president approved and concurred in such procedure. Lodge No. 655 thereupon directed a telegram to the International president requesting a thorough investigation and an opportunity for an interview. The application for the investigation and interview was apparently ignored and on August 2d 1941, the International president concurred in the action taken by the board of directors in remanding the matter to the General Grievance Committee. On August 27th, 1941, Lodge No. 655 advised the board of directors that it would take an appeal and requested a delay in the application for an adjustable seniority roster. This request was denied by the board of directors. On October 6th, 1941, the General Grievance Committee advised the general manager of the Pennsylvania-Reading Seashore Lines that the adjustable seniority roster would be substituted for the consolidated seniority roster. Said adjustable seniority roster was put into effect on or about November 8th, 1941. On October 23d 1941, Lodge No. 655 submitted the question of the propriety of the proceedings thus far taken to the International president, who refused consideration on the ground that the decision was final and not appealable to review by him. On November 12th, 1941, Lodge No. 655 filed with the International president an appeal from the action of the General Grievance Committee, who ruled as follows:
"(a) that no appeal `to the International President from the decision of the general chairman' was contemplated by *Page 593 
the rules of procedure formulated for the government of said Brotherhood; (b) `that an appeal from the action of the general chairman is to be taken to the executive committee or the general grievance committee;' (c) that `after the executive committee or the general grievance committee has determined the matter an appeal could then be taken to the International President;' and (d) that `any appeal to the International President from the decision of the executive committee or general grievance committee is to be filed with the general chairman, whose duty it would then be to transmit the appeal along with the complete record to this office for the necessary consideration."
On November 12th, 1941, Lodge No. 655, upon inquiry being made to the General Grievance Committee, was advised that the action in substituting the adjustable seniority roster for the consolidated seniority roster was to be considered the action of the General Grievance Committee. On December 2d 1941, Lodge No. 655 filed an appeal with the general chairman of the Pennsylvania Railroad East and the Pennsylvania-Reading Seashore Lines from the above action as above set forth. Said general chairman returned the appeal with the advice that the appeal should be taken in accordance with the provisions of article 18, section 4 of the constitution of the Brotherhood of Locomotive Firemen and Enginemen. On December 22d 1941, Lodge No. 655 appealed to the General Grievance Committee in the above referred to action. The matter was thereupon referred to H.M. Van Sant, vice-president, for investigation, which said investigation was held on March 27th, 1942, at Camden, New Jersey. After a report by the said H.M. Van Sant the International president rendered a decision on July 10th, 1942, denying the appeal of Lodge No. 655. On August 7th, 1942, Lodge No. 655 appealed from said decision of the International president to the board of directors of the Brotherhood. On August 22d 1942, the board denied jurisdiction until and unless the International president had been notified of said appeal. Said notice having been given, the appeal was set down for hearing on October 5th, 1942, at Cleveland, Ohio. Said board did then deny the appeal of Lodge No. 655 and sustained *Page 594 
the adoption of the adjustable seniority roster. Application was thereafter made by Lodge No. 655 to the National Labor Relations Board and the National Mediation Board. Both of said boards disclaimed any power to deal therewith. The complainants filed a bill for discovery in this court to ascertain the names of certain necessary parties, inter alia, on December 15th, 1943. During the pendency of said action a roster was posted effective as of July 1st, 1944. This roster was based on the adjustable seniority plan. Thereafter, the present bill of complaint was filed in this court.
From the foregoing recital it can be perceived that the method of determining seniority is most controversial and that the problem to date has been most sharply contested. It might almost, in the language of Mr. Justice Jackson, in Order of RailroadTelegraphers v. Railway Express Agency, Inc., 321 U.S. 342;64 S.Ct. 582, be designated "hoary litigation."
For an understanding of the difference between the two methods set up for determining seniority, perhaps a brief reference thereto should be made. As above stated, when the two railroad companies became consolidated, merged or unified and became thereafter known as the Pennsylvania-Reading Seashore Lines, the seniority theretofore held by the respective employees of the two railroad companies terminated, since the said railroad companies ceased to exist. The problem with which the new corporation was confronted was the determination of the seniorities in the new company. The basis upon which this seniority was finally determined was the ratio of the total earnings of the employees of both of the parent companies for the years 1931-1932 to the total earnings of said employees of each of said respective companies. The result of this computation showed that of the total, the West Jersey and Seashore Railroad Company employees had received approximately 64% of the earnings and the Atlantic City Railroad Company employees approximately 36% of the earnings. The duly authorized bargaining representatives of the employees for both prior companies thereupon evolved a system which contemplated a division of the employees into groups of 14. The seniority status was determined as of the unification date. In each cycle of 14 the employees of the *Page 595 
respective companies received a position commensurate with their seniority in the parent company on the following basis: one West Jersey and Seashore Railroad Company employee, one Atlantic City Railroad Company employee, two West Jersey and Seashore Railroad Company employees, one Atlantic City Railroad Company employee, two West Jersey and Seashore Railroad Company employees, one Atlantic City Railroad Company employee, two West Jersey and Seashore Railroad Company employees, one Atlantic City Railroad Company employee, two West Jersey and Seashore Railroad Company employees, one Atlantic City Railroad Company employee. When one cycle was exhausted the succeeding cycle proceeded to function. The entire controversy arises from the fact that the one-time employees of the West Jersey and Seashore Railroad Company held not only seniority rights in that railroad but in the Pennsylvania system as well, whereas the Atlantic City Railroad Company employees held seniority rights only in that railroad company. As a result of this situation, on a number of occasions the one-time employees of the West Jersey and Seashore Railroad Company, upon being accorded an opportunity to bid for runs on the Pennsylvania-Reading Seashore Lines, elected to accept runs on the Pennsylvania Railroad lines. It was then discovered that the actual earnings from the Pennsylvania-Reading Seashore Lines were not divided in a ratio of 64-36. It was, of course, attributable to the fact that some of the West Jersey and Seashore Railroad Company one-time employees having selected a run on the Pennsylvania Railroad, there occurred a vacancy in the position which they had held on the consolidated roster and the next succeeding fireman, who often was a former Atlantic City Railroad Company employee, automatically moved into that vacancy.
The question which was before the court in Franklin v.Pennsylvania-Reading Seashore Lines, supra, was the attempted enforcement of a new type of roster which had been for a short period of time adopted by the Brotherhood of Locomotive Firemen and Enginemen. This was referred to as the A and B roster, and set up separate rosters for the one-time employees of the West Jersey and Seashore Railroad *Page 596 
Company and the Atlantic City Railroad Company. It was felt that this method would more equitably succeed in continuing the ratio of earnings upon which the consolidated roster was based. The adjustable seniority roster which is now the bone of contention is to all intents and purposes a continuation of the A and B roster above referred to, in different guise. It continues, in effect, the consolidated roster with its dovetailed cycles above briefly described, but with the further proviso that in the event of the absence of any employee of either of the railroad companies, and his resulting failure to accept a run, then the opportunity to bid for such run was accorded to the next succeeding employee of such parent railroad company. The result of this is immediately apparent. In the event that a one-time West Jersey and Seashore Railroad Company employee refused to accept a run on the Pennsylvania-Reading Seashore Lines to which his seniority entitled him, and the next lower employee in point of seniority were a one-time Atlantic City Railroad Company employee, the latter would not be permitted to bid for such run, but the opportunity would be accorded to the next lower West Jersey and Seashore Railroad Company employee in point of seniority. The one-time Atlantic City Railroad Company employees contend that this, in numerous instances, resulted in a West Jersey and Seashore Railroad Company employee having lower seniority rating advancing over the head of the Atlantic City Railroad Company employee who should equitably be entitled to such a bid.
Fundamentally, the differences between the parties hereto arise from the conception by complainants that the consolidated seniority roster permanently settled their rights. The individual employee defendants, however, conceive that the basis of fixing the seniority roster, i.e., the 64%-36% ratio of earnings, was an integral although unwritten part of the roster and was intended to be maintained. To accede to the theory of complainants we must ignore the actual result of the originally adopted roster. They say, in effect, that it was at no time intended to maintain this ratio and that the ratio was only a theoretical manner of setting up some formula. When, upon this premise, a roster had been prepared, the *Page 597 
64-36 percentages were to serve no further purpose, and that the original intent was not to so maintain the respective earnings of the former West Jersey and Seashore Railroad Company and the Atlantic City Railroad Company employees.
In the voluminous briefs filed herein, this is clearly discernible. All of the arguments advanced revolve about this question of the permanency or inviolability of the consolidated seniority roster.
It must be borne in mind in this entire consideration that upon the consolidation, unification or merger of the parent railroad companies, their one-time employees had no seniority in the new railroad company and that, as far as the testimony discloses, the bargaining agents were faced with a new and novel situation, where they had no precedent to guide them. At the outset, it cannot be said that, finding itself in such a condition, the Brotherhood, as bargaining agent, was forever foreclosed from making any changes in the roster, if it discovered that the list as finally prepared did not accomplish the desired result, upon the basis agreed upon, and that what it considered inequities arose.
Complainants contend that the action taken in adopting the adjustable seniority roster was illegal in that (1) the consolidated seniority roster as originally adopted was intended definitely and permanently to fix, settle, establish and determine "the rates and conditions of pay, promotions, selections of runs, seniority, priority, time allowance and the handling of firemen;" (2) they have a permanent property right in the consolidated roster; (3) the adjustable roster was arbitrarily and fraudulently adopted and discriminated against former Atlantic City Railroad Company employees; (4) the change from the consolidated to the adjustable roster was not made in compliance with the requirements of the constitution of the Brotherhood of Locomotive Firemen and Enginemen; (5) estoppel by reason of res adjudicata; (6) failure to comply with the Railway Labor Act (45 U.S.C.A., §§ 151 et seq.), in changing from the consolidated to the adjustable roster.
Defendants contend (1) that the adjustable seniority roster was legally and properly adopted by the bargaining agent *Page 598 
of the complainants and legally recognized and enforced by the Pennsylvania-Reading Seashore Lines; (2) that in any event, these complainants are without right to individually contest the adjustable seniority roster.
It must be realized at the outset that this is not a dispute between the members of a class or craft of employees and the employer, nor a dispute between the bargaining representative of such a class or craft and the employer, but is a dispute between two groups of the members of such a class or craft within the class or craft itself. The controversy resolves itself into a question of the authority of the bargaining representative to either modify the contract of November 10th, 1933, or to supersede that contract with a new agreement. There is no claim of discrimination on the part of the Brotherhood against the employees not affiliated with it, who, for the purpose hereof, we may term non-union employees. The objection to the adjustable seniority roster was made by the 65 complainants, 37 of whom were members of the union bargaining agent and 28 of whom were not members of such agency. All 65 were treated in a like or similar manner. There is not here present that factual situation which was present in Steele v. Louisville and N.R. Co.,323 U.S. 192; 65 S.C. Rep. 226. The defendant railroad company expressed its willingness to abide by the conclusion of the bargaining agent on the question of seniority, provided that the same treatment was accorded to all employees regardless of affiliations, race, c. It was legally entitled to deal with such bargaining agent without a separate investigation of his authority. As a matter of fact, had it refused to accept or recognize the bargaining agent and its proposed changes it made itself subject to the penal provisions of the Railway Labor Act.
The court is not here called upon to pass judgment upon the respective merits of the consolidated seniority roster and the adjustable seniority roster. This it could not do in any event, provided that there was a compliance with the contractual and statutory provisions. In Division 525, Order of RailwayConductors of America v. Gorman, 133 Fed. Rep. 2d 273, the court said as follows (at p. 278): *Page 599 
"Under the laws of the Order the decision of the President on appeal was binding, it was apparently made in good faith, and courts will not ordinarily interfere with the decisions of the tribunals of a voluntary unincorporated labor organization. The court cannot substitute its judgment for that of the President of the Order. George T. Ross Lodge No. 831 v. Brotherhood ofRailroad Trainmen, 191 Minn. 373; 254 N.W. Rep. 590; Louisville N.R. Co. v. Miller, 219 Ind. 389; 38 N.E. Rep. 2d 239;Ryan v. New York Cent. R. Co., 267 Mich. 202;265 N.W. Rep. 365; Order of Railway Conductors of America v. Shaw,189 Okla. 665; 119 P. Rep. 2d 549."
The first question to be resolved is whether the complainants in any event have a standing in this court.
That a seniority right is a property right is beyond question.Dooley v. Lehigh Valley Railroad Co., 130 N.J. Eq. 75;21 Atl. Rep. 2d 334. It results that in a case properly made this court has ample jurisdiction and authority to enforce such a right.
Normally it is the duty of a member of a voluntary organization, such as the bargaining agent here is, to first exhaust his available relief within the remedial provisions of such a society before resorting to the courts for redress. This is so even though property rights are involved, and there will be no judicial interposition even in such a case until the remedy furnished by the association has been exhausted, if the remedy is adequate and the members have so stipulated. To be relieved from exhausting his remedy within the association, a member must demonstrate that such a remedy is inadequate, futile, illusory or vain. Chew v. Manhattan Laundries, Inc., 134 N.J. Eq. 566;36 Atl. Rep. 2d 205; Dragwa v. Federal Labor Union No.23070, 136 N.J. Eq. 172; 41 Atl. Rep. 2d 32; Mogelever v.Newark Newspaper Guild, 124 N.J. Eq. 60; 199 Atl. Rep. 56.
The constitution of the Brotherhood makes provision for appellate procedure for the settlement of its members' grievances. This originates in an appeal to the local lodge and in the event of dissatisfaction with its determination, to successive *Page 600 
appeals to the chairman of the General Grievance Committee, the Grievance Committee itself, or its executive committee, the International president, and finally to the board of directors.
Lodge No. 655, on behalf of complainants, as is exhibited by the foregoing recital of facts, exhausted its remedies provided for under the Brotherhood constitution. They are, therefore, properly before this court, having complied with the association's prescribed practice and having a controversy involving a property right.
Therefore, the court is faced with the duty of examining complainants' contentions that the change in the method of determining seniority was illegally or improperly accomplished. Their arguments will be considered in the order above set forth.
(1 and 2). Although the right of seniority is a recognizable property right, such a right is not inherent to employment. It must arise either from a statute or from a contract between the employer and employee. In Elder v. New York Central RailroadCo., 152 Fed. Rep. 2d 361, the court said (at p. 364):
"The seniority right of the man who toils, indoors or out, in a shop or in an office, is a most valuable economic security, of which he may not be unlawfully deprived. The right, however, is not inherent. It must stem either from a statute or a lawful administrative regulation made pursuant thereto, or from a contract between employer and employee, or from a collective bargaining agreement between employees and their employer. In the absence of statute, mere employment independent of the contractual conferring of special benefits upon those who have longest service records with the individual employer, creates no rights of seniority in retention in service or in re-employment."
A collective bargaining agreement does not create a permanent status, give an indefinite tenure, or extend rights created and arising under the contract beyond its life, when it is terminated or modified in accordance with the terms thereof. In Elder v.New York Central Railroad Co., supra, the court said: *Page 601 
"As was pointed out in System Federation No. 59 of RailwayEmployees Department of American Federation of Labor v.Louisiana A.R. Co., 5 Cir., 119 Fed. Rep. 2d 509, 515, the authorities are uniform to the effect that collective bargaining agreements do not create a permanent status, give an indefinite tenure, or extend rights created and arising under the contract beyond its life, when it has been terminated in accordance with its provisions."
In System Federation No. 59, c., v. Louisiana A. RailwayCo., 119 Fed. Rep. 2d 509, certiorari denied,314 U.S. 656; 86 L.Ed. 526; 62 S.Ct. 108, in connection with the question of seniority rights and status, the court said as follows:
"They settle it that collective bargaining agreements do not create a permanent status, give an indefinite tenure, or extend rights created and arising under the contract, beyond its life, when it has been terminated in accordance with its provisions."
The seniority rights of the complainants here arose as a result of the contract with the Pennsylvania-Reading Seashore Lines which was entered into by their duly chosen and authorized representative, i.e., the Brotherhood of Locomotive Firemen and Enginemen. Such seniority rights and the employment contract which resulted from the bargaining of their collective agent or representative are subject to the provision of the Railway Labor Act (45 U.S.C.A., §§ 151 et seq.). This being so, it follows that such seniority rights can rise no higher than the contract which gave them birth, and the statute regulating contracts of a similar nature, and any changes therein must be made not only in accordance with the provisions of such contract, but with the provisions of the Railway Labor Act as well.
A contract entered into under the Railway Labor Act is subject to revision, change, amendment and rescission provided compliance with the terms thereof and the said act are had.
In Gaskill v. Roth, 151 Fed. Rep. 2d 366, certiorari
denied; 327 U.S. 398; 66 S.Ct. 958; 90 L.Ed. 1024, the court said (at p. 372), as follows: *Page 602 
"But it refused, and declared that it would have no authority to make a new contract for the parties awarding them such a share. It recognized that under the changed conditions resulting from the new plan of operation adopted by the two railroads in 1930, the division of the labor became `peculiarly within the province of collective bargaining,' and it based its decision as to rights in respect to the inter-railroad `runs involved in the case' on the determinations made through such collective bargaining.
"We think that the court's procedure and ruling were in accord with well settled law. Its conclusion was plainly compelled by the decision of this court in Division 525, Order of RailwayConductors of America v. Gorman, 8 Cir., 133 Fed. Rep. 2d273, where the court recognized that such an agreement as was shown in this case was, under the stated circumstances, subject even to rescission and change through the collective bargaining process."
The original agreement between the firemen and the Pennsylvania-Reading Seashore Lines provided as follows:
"9-A-1. Should either the management or the firemen desire to change any or all of these regulations, the party desiring to make the change shall notify the other party in writing of the desired change; and no change will be made, except by mutual consent, until thirty days after such notice has been given."
The regulations under the agreement of April 16th, 1941, provided as follows:
"9-A-1. This Schedule of Regulations shall become effective April 16, 1941 (Rates of Pay effective October 1, 1937), and shall remain in full force and effect until changed or terminated as provided in the Railway Labor Act, as amended."
There was a compliance with the terms of both of these provisions.
There is no dispute of the due appointment of the Brotherhood of Locomotive Firemen and Enginemen in the case sub judice to act as a bargaining agent for the complainant and defendant employees of the Pennsylvania-Reading Seashore Lines. It is as well apparent from the recital of employees *Page 603 
concerned in this litigation that a majority of the firemen employed by the Pennsylvania-Reading Seashore Lines are in favor of the adjustable seniority roster. If, therefore, the Brotherhood, as a legal representative of the firemen, acted upon the direction of a majority of the class or craft involved in modifying the agreement of November 10th, 1933, or in substituting a new agreement in the place thereof, without fraud or discrimination, it legally modified the original agreement and the adjustable seniority roster is the proper schedule to determine the seniority of the employees. The agreement of November 10th, 1933, did not permanently fix and determine the seniority rights of the employees of the Pennsylvania-Reading Seashore Lines nor do they have such a permanent property right in the seniority so established that it is not subject to modification or revision.
(3 and 4.) The complainants say that the change from the consolidated seniority roster to the adjustable seniority roster was arbitrary and impliedly fraudulent. We are asked to decide from the foregoing recital of what has transpired within the Brotherhood ranks since 1933 that the change was prompted by arbitrary or fraudulent motives and that the proceedings were not in accordance with the constitution of the Brotherhood of Locomotive Firemen and Enginemen. The facts do not sustain the claim that the newly adopted roster was a result of the arbitrary conduct of the Brotherhood nor are there sufficient facts to warrant a finding that there was a fraudulent motive. The foregoing recital of the proceedings within the Brotherhood itself demonstrates that they were in accordance with the provisions of its constitution.
The bargaining agent was under the law authorized to enter into an agreement, the conditions of which might give rise to different rights of various members of the class or craft represented, but such differences had to be upon a uniform basis and without discrimination. In Steele v. Louisville N.R.Co., supra, the court said (at p. 232) as follows:
"This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on *Page 604 
differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit. Cf.Carmichael v. Southern Coal and Coke Co., 301 U.S. 495, 509,510, 512; 57 S.Ct. 868, 872, 873, 874; 81 L.Ed. 1245;109 A.L.R. 1327, and cases cited; State of Washington v. Superior Court,289 U.S. 361, 366; 53 S.Ct. 624, 627; 77 L.Ed. 1256;89 A.L.R. 653; Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580,583; 55 S.Ct. 538; 79 L.Ed. 1070. Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences."
We are, therefore, not called upon to decide whether the merits favor the consolidated or the adjustable seniority roster so long as either was adopted without fraud or discrimination. That is a question for the majority of the class or craft represented by the bargaining agent to decide. So long as this was decided in accordance with the constitution of the Brotherhood, the bargaining agent, and in conformity with the views of a majority of the craft, in a manner which was not arbitrary, fraudulent or discriminatory, this court is without power to question its enforcement.
Complainants further contend that under the constitution of the Brotherhood the defendant employees were not entitled to the re-hearing and re-consideration which resulted in the adoption of the adjustable seniority roster, and that the affirmance of the consolidated seniority roster on March 6th, 1935, was finally dispositive of the matter. Nothing appears in the constitution and by-laws which would prohibit such re-hearing or re-consideration. Under the circumstances, the Brotherhood retained the same right to hold such re-hearing as is normally retained by the appellate court. It is fundamental *Page 605 
that a court may revise its own actions by correcting errors and so modifying or setting aside its own judgment. The same rights are vested in the Brotherhood. The bargaining agent was faced with a situation which was unique. There was no precedent for the adoption of a roster which would dovetail the separate seniority lists of the parent companies into a new list. Under these circumstances, it is understandable that the original schedule might, through actual experience, prove unsatisfactory. The consolidated schedule did not only so prove unsatisfactory when actually applied, but the very theory was unsatisfactory from the start. The numerous appeals within the Brotherhood by Lodge No. 72 clearly show this. Were the court to hold that the Brotherhood's approval of the consolidated roster was final and permanent and that a re-hearing was impossible, it is conceivable that the bargaining agent could agree to a roster contrary to the wishes of the majority of the employees actually represented. The consolidated roster, when originally adopted, was predicated upon a theoretical division of earnings. If the practical application did not result in the expressed purpose thereof, there is no sound reason why the Brotherhood should not grant a re-hearing and permit the aggrieved firemen to produce evidence of the inequity of the adopted method. It is manifest that the Brotherhood should control the trials of grievances to the extent where a re-hearing may be granted to correct mistakes or errors of law or fact which it made in its conclusions. The proceedings for re-consideration were initiated and concluded in practically the same manner as if the application were an original proceeding.
"Unless prohibited by statute, an appellate court has authority to grant rehearings in cases which it has decided, by virtue of its inherent power to modify and correct its judgments so long as they are under its control." 3 Amer. Jur. 345 § 796.
The subject of this litigation was under the control of the several bodies and individual boards who successively approved the adjustable seniority roster.
Under the circumstances here present and considering all of the facts, it must be found that the bargaining agent established the adjustable seniority roster as a method of determining *Page 606 
seniority in accordance with the terms of the constitution of the Brotherhood, and with the approval of a majority of the class or craft affected.
The evidence does not sustain a conclusion that the adjustable seniority roster was fraudulently adopted, and although there is a difference or variation in the seniority rights from that provided in the original consolidated roster, it is not of such a type as could be classed discriminatory or arbitrary.
(5) Complainants contend that the proceedings heretofore had which are referred to in Franklin v. Pennsylvania-ReadingSeashore Lines, supra, are res adjudicata of the present issues. This is not so. The questions involved in that case were different from those here involved and, as a matter of fact, the court there said as follows:
"It appears to me that such inequalities as the complainants urge as reasons why they are entitled to injunctive relief and specific performance of alleged seniority contracts, are matters that may be well disposed of through the regular channels within the brotherhood in accordance with the constitution and the rules and regulations governing the same."
It is clear that Lodge No. 72 proceeded to have the consolidated seniority roster revamped or modified by a legal proceeding within the Brotherhood. It is academic that the facts and issues must be the same in a subsequent case if the complainants are to be estopped on the theory of resadjudicata.
 2 Freeman on Judgments 1322, states the doctrine as follows:
"Briefly stated, this doctrine is that an existing final judgment or decree rendered upon the merits by a court of competent jurisdiction upon a matter within its jurisdiction is conclusive of the rights of the parties or their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction, on the points and matters in issue and adjudicated in the first suit. Where a right, question or fact is distinctly put in issue and directly determined by a court of competent jurisdiction in a former suit between the same parties or their privies, the former adjudication of that fact, right or question is binding on the parties or their privies in a subsequent suit, irrespective of whether the causes of action are the same."
This statement demonstrates the patent shortcomings of the complainants in this respect. The points and matters *Page 607 
before the court in Franklin v. Pennsylvania-Reading SeashoreLines, supra, are not identical with those which gave rise to this litigation.
(6) Complainants contend that there was not a compliance with the Railway Labor Act in connection with the change of the seniority roster and therefore that such change is illegal. It is admitted by all parties that the seniority roster must fall within one of the three categories set forth in the Railway Labor Act, i.e., "rates of pay, rules and working conditions" of the firemen, and as has been pointed out by the employee defendants and the Brotherhood, "rules" clearly suggest itself as the most appropriate classification in which to include seniority rights.
The complainants make reference to section 2 of the Railway Labor Act (45 U.S.C.A., § 152, Seventh), which provides as follows:
"Seventh. No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."
Section 156 therein referred to is section 6 of the Railway Labor Act, which provides as follows (45 U.S.C.A., § 156):
"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case there such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."
It is admitted by all parties that the Railroad Company and the bargaining agent did, in the first instance, comply with the then existing statutory provisions. The Railway Labor *Page 608 
Act of 1934 had as its expressed purpose the following (45 U.S.C.A., § 151 a):
"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon the freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."
It is quite apparent that sections 152-156, having in mind the general purposes of the act, contemplated the amicable settling of disputes between the employer and the bargaining agent. The provision therein contained for notice and conference and intervention of the Mediation Board demonstrates clearly the anticipation of a possible dispute between the employer and the employee. It is the expressed desire and stated public policy of the statute to peacefully settle such disputes to avoid "any interruption to commerce." The general purposes of the act are attained and do result if an original agreement of employment or a modification of an existing agreement are amicably arrived at by the parties thereto. If such a situation arises there is, of course, no excuse or reason for a notice or conference. The notice required under the statute is to be given to the representative of the employees and not to the employees themselves and no needful purpose could be served to require such notice where there was no controversy between employer and employee. Under the circumstances here present, these provisions may be expressly waived by the parties. The complainants, therefore, cannot be heard to complain that no such notice was given to their legally constituted representative, who patently waived the same. It would, in such circumstances, be needless and ridiculous to require notice to the bargaining agent where there was a peaceful conclusion of negotiation, without any dispute as is contemplated by the statute. *Page 609 
A notice of intended change in the method of determining seniority was given by the bargaining agent to the employer. This change was not initiated by the employer. It was, as above set forth, not obliged to give any notice. The notice, if any were required under 45 U.S.C.A. 156, was one from the bargaining representative. This was given by letter dated October 6th, 1941, and complied with not only the statutory but the contractual provisions as well. There was a conformance to procedure of the pertinent statute.
For the foregoing reasons, complainants' bill will be dismissed.